JOSEPH RIPLEY v. THE ÆTNA INSURANCE COMPANY.

When at the time of applying for insurance, a paper, called in the policy a
survey, is filled out by the applicant, and delivered to the agent of the
insurer, and the policy expressly refers to such survey, and makes it a
part of the policy, any representation contained therein is to be deemed
a warranty.

And if the statements contained in such survey are to be considered pro-
missory, rather than an affirmative warranty, yet the rights and duties
of the parties are not altered. If the promise has not been kept—the
condition precedent performed—the insurer is not bound by the policy.

Rules for construing policies of insurance.

A policy of insurance was based on a written survey, in the form of question
and answer. To the question whether there was a watchman in the
building during the night, the assured answered, " there is a watchman
nights." The fire occurred between three and four o'clock in the morning,
on Sunday, when no watchman was present. And it appeared that by
the custom of the mill no watch was kept from twelve o'clock Saturday
night to twelve o'clock Sunday night. Held, that the answer, "there is
a watchman nights," was to be understood to mean that there was a
watchman in the mill every night.

Held, also, that evidence of a custom of factories in the vicinity of the one
insured, not to keep a watch from twelve o'clock Saturday night till
twelve o'clock Sunday night, should not be permitted to control the lan-
guage of the survey.

That the answers to the questions in the survey must be interpreted accord-
ing to the popular meaning of the language used.

Parol evidence cannot be received to control, explain or modify a warranty
in a policy of insurance.

Accordingly held that evidence to show that the agent of the insurers was
informed that a watchman was not kept in the building insured from
twelve o'clock Saturday night till twelve o'clock Sunday night, was
improperly received by the judge, and should have been rejected.

And it being conceded that no watch was kept from twelve o'clock on Sat-
urday night until twelve o'clock on Sunday night, it was held that the
warranty was broken, and that the effect of the breach was to annul the
policy, without regard to the materiality of the warranty, or whether the
breach had anything to do in producing the loss.

A provision in a policy of insurance that no action shall be brought for the
recovery of any claim upon it, unless the same shall be commenced within
one year from the happening of the loss or damage, is valid and binding.

Such a condition may be waived, however, by the act of the parties. But
a waiver, to be operative, must be supported by an agreement founded on

a valuable consideration; or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition.

Where the insurer on being applied to for the payment of a loss, under a policy containing such a condition, declined paying it, on the ground that actions had been commenced against it by other parties, which were still pending, and declared it would do nothing in reference to such loss while those suits were pending. *Held*, that this did not amount to a waiver of the condition; nor was the defendant estopped from insisting on the condition.

*Appeal from the judgment of the general term of the Supreme Court of the first district, affirming a judgment in favor of the plaintiff at the Circuit, and from an order affirming an order denying a motion for a new trial made on the judge's minutes, at the Circuit.*

THE action was upon a policy of insurance issued by the defendant upon the factory building, and the stock and goods therein, of the Glendale Woolen Company, a corporation located and doing business at Glendale, in the state of Massachusetts. The defendant is a corporation duly organized, and located and doing business at Hartford, in the state of Connecticut. The policy is dated the 11th of September, 1848, and expired on the 11th of September, 1849, and was for the sum of $12,500.

The application for insurance was made to Plunkett & Hurlburt, who resided at Pittsfield, in Massachusetts, and who acted as agents for the Protection Insurance Company of Hartford, as well as for the defendant. It was the practice of their agents, when an application was made for a greater amount of insurance than either of said companies would assume, to make a single survey and send it forward to one of said companies, and the companies which would assume shares of the risk would agree on the amount of premium, and the portion each would assume. Plunkett, in pursuance of the request of one of the directors of the Glendale Manufacturing Company, called at the factory, examined the same, and left to be filled up and returned to him a printed blank, containing questions to be

answered by the officers of said company. This paper, when the answers were given, is called a survey. Amongst other questions in said paper to be answered, and which were answered, were the following: "Is there a watchman in the mill during the night? Is there also a good watch clock?" To which the following answers were returned, viz: "There is a watchman nights—no clock; bell is struck every hour, from eight P. M. till it rings for work in the morning." Question: "Is the mill left alone at any time after watchman goes off duty in the morning till he returns to his charge in the evening?" Answer: "Only at meal times and on the Sabbath, and other days when the mill does not run."

The survey containing the foregoing questions and answers was forwarded by said Glendale Company to Plunkett & Hurlburt, and by them to the Protection Insurance Company of Hartford. Negotiations were had between said Protection Insurance Company, the said agent, and the defendant, by which it was arranged that, of the whole sum proposed to be insured, the said defendant should take $12,500, and the Protection the rest, at a premium mutually agreed upon.

The policy issued by the defendant contained the following clause in reference to said survey, viz: "These premises are more fully described in survey No. 83, on file in the Protection office with Plunkett & Hurlburt's returns, which survey is made a part of this policy." Annexed to said policy was the following, amongst other conditions in reference to which it was declared in the policy, that the said policy was made and accepted, to wit: "It is furthermore hereby expressly provided that no suit or action of any kind against said company for the recovery of any claims upon, under, or by virtue of this policy shall be sustainable in any court of law or chancery unless such suit or action shall be commenced within the term of twelve months next after any loss or damage shall occur, and in

case any such suit or action shall be commenced against said company after the expiration of twelve months next after such loss or damage shall have occurred, the lapse of time shall be deemed as conclusive evidence against the validity of the claim thereby so attempted to be enforced."

On Sunday morning, the 8th of April, 1849, the said factory, and its contents, were destroyed by fire; after which notice of the loss, and proofs thereof, were delivered to the defendant, in conformity with the provisions of said policy.

The defendant sent an agent to inquire into the facts concerning the fire, and then for the first time, as it was claimed by the defendant, did it learn that no watchman was accustomed to be in said factory from twelve o'clock on Saturday night till twelve o'clock on Sunday night; and the fire occurred while no watchman was in the building. The defendant refused to pay the loss, on the ground that answers in the survey to the questions, in regard to a watchman in said factory, above set out, were a warranty, and it had been broken, and the company was not, therefore, liable on said policy.

After the expiration of sixty days from the presentation of the proof of loss, the agents of the insured applied to the defendant for payment of the loss, which was at that time declined, on the ground that actions had been brought by several parties—one against said Glendale Company, and others against other parties interested in the stock of said company—claiming whatever might be payable on said policy; and the defendant would do nothing in reference to said loss while suits were pending. Said suits were never disposed of. Subsequently, the defendant refused to pay anything toward said loss, on the ground that the warranty hereinbefore referred to was broken. Negotiations between the parties were continued, for compromise and payment, without arriving at any results.

Finally, before the end of a year from the loss, an action was commenced in Connecticut against said defendant, on said policy; which suit was subsequently withdrawn, after the decision in the court of errors of Connecticut in an action on the policy issued by the Protection Company, in favor of said company, on the ground that the warranty was broken and the company not liable on the policy.

This action was commenced in December, 1852. The plaintiff, in his complaint, after setting out the issuing of the policy, the destruction of the property by fire, and the furnishing of proof of loss, &c., and the refusal to pay on the ground that the questions and answers in the survey constituted a warranty, and that it was alleged to have been broken, proceeds to allege, on information and belief, that said questions and answers were not understood by either of the parties to be—and were not in fact—a warranty; and that said policy was procured through Plunkett & Hurlburt, agents of the defendant, who, before said policy was issued, had notice and well knew that it was the invariable practice of said company to have no watchman in the mill from midnight after Saturday to the following midnight, and that it was the intention of the agents of both parties to frame the questions and answers so as to convey that idea; and if the true construction of the language was otherwise, it was so expressed through mistake. Judgment was demanded for the whole sum insured.

The defendant, in its answer, after admitting some and denying others of the allegations in said complaint, set up by way of affirmative defence, 1st. The breach of the warranty; and 2d. That the suit was not brought within one year from the date of the loss.

On the trial, the questions principally litigated were, 1st. Whether the defendant's agent, Plunkett, was informed at the time he made the examination of the factory premises, before said survey was made out, that no watch was kept in said factory from midnight after Saturday until the

midnight following, upon which there was conflicting evidence. The plaintiff was permitted to prove, under objection by the defendant, that it was the custom of mills in that region of country not to keep a watch during the time mentioned, and when Sunday began and ended by the custom and usage of the people.

The second question was, whether the limitation of one year for bringing the suit had been waived; and the act of waiver relied upon mainly was the refusal to pay until the garnishee suits, so called, were ended; and that as said suits were not ended within the year, the condition of the policy was waived; and that negotiations for compromise were continued between the parties even beyond the year. On this point there was a conflict of evidence.

The defendant, after the evidence was closed, moved to dismiss the complaint, on the following grounds:

1. The limitation as to the time for bringing an action on the policy, to one year, was valid and binding.

2. That no waiver thereof had been proved.

3. That breach of the warranty discharged the defendant from the obligation to pay said loss.

The court denied the motions; holding that the question of waiver was one for the jury, and that by the true construction of the question and answer as to the watchman, the insured were excused from keeping a watch from twelve o'clock, Saturday night, to twelve o'clock, Sunday night; to which rulings and decisions the defendant's counsel excepted. The defendant's counsel requested the court to charge the jury:

1. That they should find a verdict for the defendant on the question of waiver of the limitation of the action.

2. That inasmuch as a suit was in fact commenced within a year, the acts of the defendant in reference to the commencement or non-commencement of an action is wholly immaterial.

3. That the letter of the defendant's attorney to the

assured of 7th of August, 1849, refusing to recognize the existence of any claim for loss on the policy, put the insured on their guard, and imposed on them the duty of bringing an action.

4. What was done after suit brought in Connecticut cannot be considered in determining the question of waiver.

5. That the recovery must be limited to $10,000, being the loss on the property of the Glendale company.

The court refused so to charge, and the defendant's counsel excepted.

The court, amongst other things, charged the jury that if the defendant suggested a postponement until certain attachments were removed, and at the same time was silent in regard to the limitation, this would be a waiver. And that they should determine whether there was any positive act of the defendant which was intended to induce, and did induce the insured to postpone the suit until after the expiration of the year. To each of which instructions the defendant's counsel excepted.

The jury found a verdict for the plaintiff for $15,150, and found the loss on stock insured to be $3,787.50, for which sums judgment was rendered. And the same was affirmed by the general term. (See 29 Barb. 552, S. C.)

*George F. Comstock,* for the appellant.

I. The eighth question in the survey, with the answer thereto, constituted a warranty, which required a watch to be kept during all the nights of the week. The breach of this warranty vitiated the policy, and discharged the defendant. The contrary doctrine having been held at the trial, the judgment should be reversed on this ground. (*Glendale Company* v. *Protection Insurance Company*, 21 Conn., 19; *Houghton* v. *Manufacturers' Insurance Company*, 8 Metc. 114; *Farmers' Insurance Company* v. *Snyder*, 16 Wen. 481; *Alston* v. *Mechanics' Insurance Company*,

4 Hill, 330; *Jennings* v. *Chenango Insurance Company*, 2 Denio, 75; *Kennedy* v. *St. Lawrence County Insurance Company*, 10 Barb. 285; *Wall* v. *Howard Insurance Company*, 14 Barb. 383; *Gates* v. *Madison County Insurance Company*, 2 Comst. 43; *Wilson* v. *Herkimer County Insurance Company*, 2 Selden, 53; *Wood* v *Hartford Insurance Company*, 13 Conn. 533.)

II. The provision in the policy that no suit should be sustained against the company to recover for a loss unless commenced within twelve months, is entirely consistent with public policy, and is valid. (*Gray* v. *Hartford Insurance Company*, 1 Blatch. 280; *Wilson* v. *Ætna Insurance Company*, 27 Vermont, 99; *Williams* v. *Vermont Insurance Company*, 20 Vermont, 222; *Leadbeater* v. *Ætna Insurance Company*, 1 Shepley, 267; *Worsley* v. *Wood*, 6 Tenn. R. 718.)

III. This suit was not brought until nearly four years after the loss, and therefore it cannot be maintained. The court at the trial erred in submitting to the jury the question whether the limitation clause in the contract had been waived or discharged. There was no evidence having the slightest tendency to establish such waiver.

1. No doubt the parties might agree with each other, before or after the loss, to strike from the contract the clause in question. But it is not pretended that any such agreement was made, nor even that the clause was ever mentioned, considered or thought of in any written or oral intercourse between them at any time subsequent to the making of the policy. Consequently there is no waiver arising out of anything in the nature of a mutual stipulation, having by itself the force of a contract. As nothing of the kind ever took place it is unnecessary to speak of the absence of a consideration for any such agreement or stipulation.

2. There was no language or conduct on the part of the defendant intended or calculated to mislead the insured party, or which was accepted by such party, as an induce-

ment to postpone the commencement of the suit until after the twelve months. The contrary is exactly the truth. (*a.*) When only two and a half of the twelve months had elapsed, the secretary of the insurer both said and wrote to the insured that certain garnishee suits ought to be removed before negotiating, &c. This suggested no postponement of suit, certainly none beyond the twelve months. (*b.*) But the defendants immediately after took ground against the claim, and formally announced their determination on the 7th of August, 1849, when only four of the twelve months had elapsed. (*c.*) The insured party accepted this announcement as decisive, and actually commenced suit in September, 1849, before six of the twelve months had elapsed. (*d.*) If any thing took place afterwards which can be called negotiation, manifestly it could have nothing to do with the limitation of time for bringing a suit already commenced.

IV. The court not only submitted the question of waiver to the jury, but specially charged as follows: "In the language of the general term, if the defendants suggested a postponement until certain attachments were removed, and at the same time were silent in regard to the limitation, I am bound by this decision to charge you that this would be a waiver." This was erroneous, because it instructed the jury not to deliberate upon the matter of fact and intention, but peremptorily to find that the limitation was waived. The only evidence to which this part of the charge could refer was that of Goodrich, showing that in June, 1849, Mr. Loomis, the secretary of the defendant, declined to pay the loss when called upon so to do, and stated as a reason that garnishee suits were pending which ought to be disposed of before negotiating concerning the claim. This was nine and a half months before the expiration of twelve months from the time of the loss. This not only was not in law a waiver of the limitation, but it would not authorize a jury to find such

waiver. That it was not a waiver is still more apparent when it is considered that soon afterwards, (August 7th, 1849,) the defendant peremptorily rejected the claim, and that a suit was actually brought upon it before half the period of limitation had expired.

*D. D. Field*, for the respondent.

I. The first and most material question in this case is the true meaning of the survey. Whether the reference which the policy makes to that survey renders it a warranty or merely a representation, is a question not raised upon this record; though the plaintiff has always insisted and does still insist that the survey is referred to merely for a description of the premises, and its answers about the workings of the mill are not warranties. But, as that is not a question here, no further reference will be made to it. What is the true meaning of the questions and answers taken together? Do they import that the watchman was to be in the mill during any part of Sunday? If they do, the court below was wrong. If they do not, it was right. The defendants' construction rests upon the single word "nights," which they insist must mean the total period of obscuration during the entire year, from the twilight of the evening to the twilight of the morning of every twenty-four hours, from the 1st of January to the 31st of December. The plaintiff, on the other hand, insists that the word *nights*, taken by itself, has not so comprehensive a meaning; and especially that, taken in connection with the rest of the answer, it is plain that it does not cover the hours of darkness in the Christian Sabbath.

1. The word "nights," in ordinary speech, does not signify the whole of the night-time. When we speak of a person's calling obliging him to be out nights, we do not mean that he is obliged to be out all night. The physician is compelled to be up nights, the soldier and the sailor to

10

keep watch nights; but none of them is kept awake during the whole period of darkness. The same word occurs again in the answer to the fifteenth interrogatory, where it would be absurd to suppose it meant all the time of night. On both occasions on which it is used, the word is something equivalent to "o'nights," or "at night," or "after dark," or any other expression which refers to the night-time in general, as distinguished from the day-time.

. 2. The answer does not follow the language of the question. That was, "Is there a watchman in the mill during the night?" this, "There is a watchman nights"— an answer which certainly should suggest to the person receiving it that the person making it did not mean to warrant that there should be a watchman who should stay in the mill during every hour of every night. One of two things seems evident: either the person answering understood the question to be broader than the answer, and meant to give an answer which fell short, or, what is the more probable, he understood both the question and the answer to have the same restricted meaning.

3. If the word "nights" were far more comprehensive than it is, the context and other parts of the survey would limit it.

(*a.*) The eighth interrogatory consists of two parts, which following each other without a break, would read: "Is there a watchman in the mill during the night, and if so, is the mill left alone at any time after the watchman goes off duty in the morning till he returns to his charge at evening?" The answers then, put into one, might be read thus: "There is a watchman nights; but the mill is left alone on the Sabbath and other days when it is not run, and it is also left alone at meal times of the day when it is run." The interrogatory assumes of course that there is no watchman when the mill is left alone; and the answer is explicit that the mill is left alone every non-working day and every meal time of every working day. There would

thus be half an hour, or perhaps an hour, every morning; every noon, and every evening, with the fires in full blast and the materials disposed about the building for use, when not a single person, workman or watchman would be in the mill.    The defendants' construction would require a watchman to come to the mill every evening and stay all night, though the mill should be stopped for a month, or for even half the year.

(b.) The answer to the inquiry about a watch-clock indicates that the watchman comes at 8 P. M., and stays till he rings the bell for work in the morning; for the object of a watch-clock is to insure the fidelity of the watch, and the mention of the bell is introduced to give this assurance of his fidelity, that he is obliged to be on hand and wakeful during every hour between the designated limits.    When the answer adds, "No clock; bell is struck every hour from 8 P. M. till it rings for work in the morning," it plainly shows that the person who made it did not intend to apply it to the night preceding Sunday; for no work was done on Sunday, and no bell would be rung on the morning of that day.    Taking the whole answer together, it is plain that "nights" does not cover the entire night preceding Sunday.    This construction is supported by the next language of the same question and answer, which were as follows:    "Q. Is the mill left alone at any time after the watchman goes off duty in the morning till he returns to his charge in the evening?    A. Only at meal times, and on the Sabbath and other days when the mill does not run."    To the person who made the former answer, the words "after the watchman goes off duty in the morning" would mean after the "bell has rung for work in the morning" (to use the language of his former answer), which, of course, would refer only to working days, and would exclude Sundays.    His answer is, therefore, "only at meal times" (on working days).    He adds the rest of his answer with reference to the understanding with which he had

answered the former question; for as he plainly did not intend to apply that to the night preceding Sunday, so, when he is asked whether the mill is ever left alone after the watchman goes off duty in the morning—that is, on those days when the bell rings for work in the morning, or on working days—he naturally adds, after the proper answer to the question, "on the Sabbath and other days when the mill does not run," meaning, that as these were not working days "when the watchman went off duty in the morning," the former part of his answer did not apply. On the Sabbath and other holidays, he says, the mills were left alone, but not from any hour when the watchman went off duty in the morning; for he went off duty when the bell rang for work, and that was an incident only of working days. The watchman's going off duty in the morning evidently did not apply in his mind (and so he meant to express it) to Sundays and holidays.

(c.) The word "Sabbath" means all the time between twelve o'clock Saturday night and twelve o'clock Sunday night. At common law, the day begins and ends at midnight; and that is the rule in this country, except in those states where the day is otherwise defined by statute or usage. To this point, and as to the meaning of Sunday, see *Butler* v. *Kelsey* (15 Johns. 177); *Pulling* v. *The People* (8 Barb. 385).

(d.) The rest of the answer is to be understood with qualifications, for the bell does not ring every hour on Sunday. The next answer showed that the mill was left alone on Sunday. The questions were asked with reference to the days of work, and the danger of working the mill.

(e.) The exception of the "Sabbath" was made in conformity with the habits of the community where the mill was situated. These forbid or discourage labor on any portion of the Sabbath; and to require one to watch a mill during that time, though it might be justified to them by necessity, would certainly be a departure from the ordinary

habits of their society. This circumstance, while it might not control, would serve to indicate the sense in which the language was used and understood.

(*f.*) The answer to the ninth interrogatory gives another instance of the context qualifying a particular expression. The inquiry is "whether the waste is removed daily," and the answer is in the affirmative; and yet, unquestionably, neither the person asking nor the person answering understood by this that the waste was to be removed on the Sabbath.

(*g.*) The fifteenth question and answer give still another instance. The inquiry is, "during what hour is the factory worked?" and the answer is, " summer, commence at 5 o'clock A. M., work till dark; winter, commence as soon as we can see in the morning, work till 8 o'clock P. M., etc." In neither is there any exception of the Sabbath or holidays; and yet it is certain that neither of the parties understood that the work was to begin in the morning and end in the evening of those days.

(*h.*) The sixteenth interrogatory asks about the fires " when the work ceases at night;" and yet it is plain that this refers not to the beginning of the darkness, as the strict interpretation of the word " at night" would make it, but to any hour during the night when the work ceases.

4. The transaction bears evidence, throughout, that the solicitude of the insurers was about the exposure arising from the working of the mill. A factory lying idle is no more exposed than any other building, and would no more require watching, or justify a larger premium for insurance. The defendant's construction, however, would require a watchman every night, if the dam should give way and the business be suspended for the greater part of the year. If, on the other hand, it be conceded, as it should be, that, in such an event, there would be no need of watching the mill, the accuracy of the plaintiff's construction, respecting the watching on Sunday, is demonstrable. If, for example,

the 4th of July had happened to fall on Saturday, the fires would have been extinguished Friday evening; and the watchman need not have come Saturday evening, or been there during any part of the darkness between Saturday evening and Sunday evening. But the defendant's construction would require the watchman to stay till daylight Saturday morning, and to come again at twilight on Sunday evening, though he might stay away the whole intermediate period. Or, suppose the mill stopped for the whole summer season, beginning on the last day of June and ending on the last day of August, the defendant would have the watchman stay till daylight of the first of July and come again at twilight on the last of August. For the reasons thus given, the plaintiff submits that the court below was right in its ruling, "that, by the true construction of the eighth question and answer in the survey, the insured were excused from keeping a watch from twelve o'clock Saturday night to twelve o'clock Sunday night." For a case in some respects similar, see *Prieger* v. *Ex. Ins. Co.* (6 Wis. 89.) The plaintiff's counsel has not thought it neceesary to discuss particularly the decision of the court in Connecticut, reported in 21 Conn. 19. That decision is not authoritative, and certainly is not entitled to greater respect than that of the supreme court of this State. The contract of insurance was not made in Connecticut, but in Massachusetts. Even if it had been made in the former State, as the question is one merely of the meaning of ordinary language, the court there would have no especial jurisdiction to explain it.

II. The next question concerns the limitation contained in the thirteenth of the conditions annexed to the policy. On this point the plaintiff claims:

1. That the condition was void as against the policy, if not the very terms, of the law.

2. That, if it was a valid condition, it was for the benefit of the insurers, and might be waived by them.

3. That the court below was right in its instructions to the jury respecting the evidence of waiver.

The condition was that no suit for the recovery of any claim under the policy should be sustainable in any court of law or chancery, unless commenced within twelve months after the loss; or, if any suit was brought after that period, the lapse of time should be deemed conclusive evidence against the validity of the claim. In this state the question must be regarded as an open one, notwithstanding what was said in *Ames* v. *New York Union Ins. Co.* (14 N. Y. 266), since that was not necessary to the decision of the case. In other states the decisions are conflicting, though the preponderance is undoubtedly in favor of the validity of the condition. It has been held valid in Ohio (*Portage Insurance Co.* v. *West,* 6 Ohio U. S. 599); in Georgia (*Brown* v. *Savannah Insurance Co.,* 24 Geo. 97); in Pennsylvania (*N. W. Insurance Co.* v. *Phœnix O. and C. Co.,* 31 Penn. 448); in Rhode Island (*Brown* v. *Roger Williams Insurance Co.,* 5 R. I. 394); in Massachusetts (*Fullam* v. *N. Y. Insurance Co.,* 7 Gray, 6; see also *Armstrong* v. *Bowditch M. F. Insurance Co.,* 6 Gray, 596); in Vermont (*Williams* v. *Vermont Insurance Co.,* 20 Vt. 222; *Wilson* v. *Ætna Insurance Company,* 27 Vt. 99); in Maine (*Leadbeater* v. *Ætna Insurance Co.,* 1 Shepl. 267); in Tennessee (*Wisely* v. *Wood,* Tenn. 718); and by Mr. Justice NELSON, in *Cray* v. *Hartford Insurance Co.* (1 Blatch. 280). It has been held invalid in Indiana (*Eagle Insurance Co.* v. *Lafayette Insurance Co.,* 9 Ind. 443), and by Mr. Justice McLEAN, in *French* v. *Lafayette Insurance Co.* (5 McLean, 461). We are thus at liberty to discuss the question upon principle. The objection to the condition is that it is repugnant to the fair construction of the statute of limitations; or, if not thus repugnant, it imposes a restraint upon the assertion of a right in the tribunals of the country not imposed by the law of the land. Our statute declares that " civil actions can only be commenced

within the period prescribed," &c. (Code, § 74), and that "the periods prescribed in section seventy-four for the commencement of actions other than for the recovery of real property shall be as follows," &c.   (§ 89.)   If the language had been, civil actions can be commenced within the periods prescribed, and those only, there would have been a clear repugnance between the statute and the condition in question.   Is the repugnance less real because the language of the statute is a little different?   Is not the language indeed equivalent to a declaration that actions may be commenced within the prescribed periods, and not after?   But, independent of this consideration, the attempt to impose a restraint on the assertion of a right not imposed by law should seem not to be defensible.   If it may be done in one respect, there seems to be no sufficient reason why it may not be done in another.   Thus parties might, with equal propriety, stipulate that no suit should be brought but in the name of the insured; that no attachment, injunction, or other provisional remedy should be obtained in such suit; that the defendants might answer without oath; that a jury-trial should be waived; that a reference should in all cases be agreed upon; that particular referees should be selected; that execution should issue only after a certain time, or upon certain conditions, and the like.   It has been said in some of the courts (*Nute* v. *Hamilton Insurance Co.*, 6 Gray, 174; *Hall* v. *People's Insurance Co.*, 6 Gray, 185; *Cobb* v. *New England Insurance Co.*, 6 Gray, 192), that a stipulation not to sue in a particular court, which is admitted to be void, differs in this respect from the stipulation as to the time of suing. The effect, however, of the stipulation as to time is to drive the insured into a particular court.   Thus the defendant is a foreign corporation.   A suit against it in this state cannot be brought unless the insured is fortunate enough to find property here to attach.   What is the party then to do but seek the corporation in the state where it was

created, though it contracted the obligation, and the cause of action accrued elsewhere?   Again, this court has held that the statute of limitations does not run at all against a foreign corporation.   (*Olcott* v. *Tioga R. R. Co.*, 20 New York, 210.)   Here, however, is a limitation stipulated by the corporation, which over-rides the rule.   For these rea·sons it is submitted that the condition is not valid.   But, if it were valid, it could be waived, because it was for the benefit of the insurer.   Even a constitutional right may be waived.   (*Lee* v. *Tillotson*, 24 Wend. 337; *Baker* v. *Braman*, 6 Hill, 48.)   There is more reason why the conditions of a private contract should be waived.   The language of the courts on this point is decisive.   (*Ames* v. *New York Union Ins. Co.*, 14 New York, 253.)   What will amount to a waiver must depend upon the circumstances of each case. This rule, however, may be safely laid down, that any act or declaration of the insurer which misleads the insured, or induces him to wait for any period whatever, is inconsistent with good faith in afterwards insisting upon the limitation, and is therefore a waiver of it.

III.   The two preceding points cover the principal questions in the cause.   The remaining questions are subsidiary and incidental.   One of them is this:   Was the evidence which was received in the earlier stages of the trial, touching the understanding of the parties upon the subject of a watch erroneously received; and if so, is it a cause for a new trial?   The plaintiff claims that the evidence was proper in itself when given, and that its becoming afterwards immaterial did not make it erroneous to have received it.   The theory of the plaintiff's case was, that the survey did not really mean what the defendant claimed; but that if it did, it was a mistaken expression, which misled nobody, and should now be corrected.   He was bound to give his whole evidence before he rested, and the judge was not bound to declare the law till the evidence was closed on both sides.   If, therefore, the evidence would have been

proper on the supposition of a mistake, it was proper when given. To hold the contrary would make it necessary to reverse the order of a trial. Either the judge must declare at the outset how he means to charge the jury, or the plaintiff must be permitted to give evidence applicable to either aspect of his case, if it happen to have two aspects.

IV. The first exception was properly overruled. It was competent for the plaintiff to claim payment for the loss, either on the ground that the policy, as it stood, was to be interpreted according to his view, or that if interpreted otherwise, it was mistakenly expressed, and should therefore be reformed. There is nothing inconsistent in the claim; the code allows it, and so this court has repeatedly decided. (*Emery* v. *Pease*, 20 N. Y. 63; *New York Ice Company* v. *N. W. Insurance Company*, 23 N. Y. 357; *Barlow* v. *Scott*, 24 N. Y. 40.) The expression of the plaintiff's counsel, that the proposed evidence was to be adduced " as to the mistake in the policy," is to be explained by reference to the language of the pleadings. The complaint averred, that it was the intention of both parties to the insurance to express the idea that it was the invariable practice of the company insured to have no watchman in their mill from midnight after Saturday to the midnight following; and that if the true construction of the language of the policy was different, the expression used was employed only by mistake. All these allegations were directly put in issue by the answer. The evidence proposed by the plaintiff was offered to support these averments; in other words, to show, either that the construction relied on by the plaintiff was the true one; or that if it was not, then the language was employed only by mistake. In either of these aspects, the evidence was competent and admissible.

1. It was competent in support of the construction which the plaintiff claimed as the true one, on the principle that

extrinsic parol evidence is admissible to explain an ambigu-
ous or uncertain writing. The defendants claimed that the
questions and answers constituted a warranty on the part
of the company, that they would keep a watchman in their
mill through the hours of every night in the week, from 8
P. M. to the usual hour of commencing work in the morning.
The plaintiffs, anticipating this defence, aver that it was
the intention of both parties to the insurance to convey by
these questions and answers, the idea that there was "no
watchman in the mill from the midnight after Saturday to
the midnight following." When the parties to a contract
differ in respect to the true interpretation to be given to
their language, and especially when this language is in any
respect indeterminate or uncertain, the court may and will
resort to the evidence of surrounding and extrinsic circum-
stances and facts; not to vary or contradict the writing, but
to explain it. (*Moore* v. *Meacham*, 10 N. Y. 211.) It was
either the province of the court to decide which of the two
constructions was the true one; or, if it did not think the
import of the language itself to be certain and unmistaka-
ble, parol, extrinsic evidence of the surrounding circum-
stances was competent to explain the language, and so to
aid in the construction of it. (*French* v. *Carhart*, 1 Comst.
102; *Blossom* v. *Griffin*, 13 N. Y. 573.)

2. If the court construed the language in question
adversely to the plaintiff, the offered evidence was compe-
tent to show the mistake which he had averred in his com-
plaint, and which the defendant had traversed in his
answer. (*Bartlett* v. *Judd*, 21 N. Y. 200; *Kent* v. *Man-
chester*, 29 Barb. 595; *Leavitt* v. *Palmer*, note, 3 N. Y. 19;
*Marvin* v. *Bennett*, 26 Wend. 169; *Gates* v. *Green*, 4 Paige,
355; *New York Ice Co.* v. *N. W. Ins. Co.*, 23 N. Y. 357.)

3. It was not a valid objection to the evidence that "the
complaint did not * * * ask leave to reform the policy."
It was competent for the court to reform the policy, if it
were necessary, even though relief of that kind was not

asked in the complaint. Under § 275 of the code, whenever the defendant has answered, the court may grant any relief consistent with the case made by the complaint, and embraced within the issue. · In such a case, the particular demand of relief becomes immaterial. (*Marquat* v. *Marquat*, 2 Kern. 341; *Jones* v. *Butler*, 30 Barb. 641; And see Anon. 11 Abb. 233.)

4. But if there was any force in the defendants' objection, it was obviated by the subsequent action of the court, in its adoption of the plaintiff's construction.

V. The defendant's objections to proof of the custom in respect to watching mills on the Sabbath were invalid, and his exceptions to the admission of such evidence must fail. The evidence of the custom, at the time of the negotiation for insurance, was admissible, because, if proved, this was one of the circumstances attending the contract, and explaining the language in which it was contained. Whether the custom alleged was a general or a local one, proof of its existence was certainly admissible. The pleadings had, moreover, distinctly made and traversed the allegation, "that the defendant knew that it was the invariable practice and custom of the company to have no watchman in the mill from the midnight after Saturday to the midnight following."

The defendant's third and fifteenth exceptions must fail. The question of the admissibility of evidence to prove intention is one of relevancy merely. Under the pleadings in the case, it was competent for the plaintiff to show mistake, and for the court to grant relief against it. And when it is competent for a person, who seeks equitable relief against mistake, to prove that a writing does not truly express his intention, proof of that intention is of course relevant. But the court sustained the plaintiff's construction of the survey; and therefore, even if the evidence should have been excluded, the objection was rendered immaterial.

MULLIN, J.   Much evidence was given on the trial for the purpose of reforming the application for insurance, so that the answers to the questions in regard to the keeping a watchman in the factory should be made to express the understanding of both parties on that subject.   But, inasmuch as the learned justice who tried the cause held that the application needed no reformation; that, by its terms, the insured were not bound to keep a watchman in the factory from twelve o'clock on Saturday night until twelve o'clock on Sunday night; the case is relieved of the questions raised on the trial, as to the competency of the evidence given for the purpose of procuring a reformation of the contract, and whether a case was made by the evidence that would have entitled the plaintiff to that relief.

Before proceeding to ascertain what the construction of the clause of the application under consideration is, it is important to know whether it is a warranty or a representation merely.

The paper which contained the questions and answers in regard to keeping a watchman in the factory is called, in the policy, a survey, and this survey is expressly referred to in the policy and made a part of it.

Angell, in his work on Fire and Marine Insurance, defines a warranty as being a stipulation inserted in writing on the face of the policy, on the literal truth or fulfillment of which the validity of the entire contract depends.   The stipulation is considered to be on the face of the policy although it may be written on the margin, transversely, or on a subjoined paper referred to in the policy.

What is said on the subject of a watch in the factory is contained in the survey, filled out by the insured and delivered to the agent of the insurer, and the policy refers to and makes this survey a part of itself.   It is, therefore, clearly within the definition of a warranty as laid down by the learned author of the treatise cited, as well as that given by our own courts to that term.   (*Jefferson Insu-*

*rance Company* v. *Cotheal,* 7 Wend. 73; *Brown* v. *Cattaraugus Ins. Co.,* 18 N. Y. 385; *Chase* v. *Hamilton Ins. Co.,* 20 id. 52.)

If at the time the survey was made the factory was not in operation, and the statements contained in it as to the watch kept therein is to be considered promissory rather than an affirmative warranty, yet the rights and duties of the parties are not altered. If the promise has not been kept—the condition precedent performed—the insurer is not bound by the policy. (Angell on Insurance, § 145; 2 Duer Ins. 749; 1 Arn. 502.)

The clause of the survey being a warranty, it then becomes important to ascertain its construction, in order to determine whether it has been broken. In construing contracts of insurance, effect must be given to the intention of the parties, as in the construction of all other contracts.

The rule is very clearly stated by Lord ELLENBOROUGH, in *Robertson* v. *French* (4 East, 135). The same rule of construction which applies to all other instruments applies equally to this instrument of a policy of insurance, viz: that it is to be construed according to its sense and meaning as collected, in the first place, from the terms used in it, which terms themselves are to be understood in their plain, ordinary and popular sense, unless they have generally in respect to the subject matter, as by the known usage of trade, or the like, acquired a peculiar sense distinct from the popular sense of the same word, or unless the context evidently points out that they must, in the particular instance, and in order to effectuate the immediate intention of the parties to that contract, be understood in some other special and peculiar sense."

It was of the highest importance to the insurer, in order that it might be able intelligibly to decide whether it would assume the risk, or, if it assumed it, to fix the premium to be charged, to know whether a watch was kept in the factory proposed to be insured, at what time such

watch was kept, and the means, if any, of determining whether he discharged faithfully his duty. The question "Is there a watchman in the mill during the night?" was a very significant one, and the answer, "There is a watchman nights," was a full response to the inquiry. A watch clock being constructed so as to require the watchman to be at it each hour, or his absence would be discovered in the morning, the question whether there was a watch clock was also a very significant one. Their answer was, there was no clock, but the bell was struck every hour, from eight P. M. until it rang for work in the morning, furnished perhaps the next best means of securing watchfulness on the part of the watchman.

The next question to which an answer was required is: "Is the mill left alone at any time after the watchman goes off duty in the morning till he returns to his charge at evening." To which it was answered: "Only at meal times, and on the Sabbath and other days when the mill does not run."

Fires in the factory might be produced in either of four modes: From fire used in the building, from the friction of the machinery, spontaneous combustion, and by an incendiary. There was no danger from fire used in the building, when the building was not occupied, except for a few hours after each day's work closed, and until it was put out. Nor was there any danger from friction, unless the machinery was in motion; nor from incendiaries, unless when there was no person in the mill; but there was constant danger from spontaneous combustion. A watch in the factory during the night afforded a great security against injury from fire from any cause, in the night; and as the danger existed every night in the week, it was important to the insurers to know whether a watch was on hand every night.

It being important to the insurer to know whether a watch was kept every night, and the question put being

general whether a watch was kept during the night, the answer that there is a watch nights, must have been understood to apply to every night. No exception being made in the question, and there being an obvious necessity for a watch every night, both parties must have understood the question and answer to apply to every night. If the insured intended to exclude any night, they should have done it clearly and distinctly. It was no more difficult to say that no watch was kept from twelve o'clock Saturday night to twelve o'clock Sunday night, than it was to exclude the Sabbath in the answer to the next question. And the fact that an exception was made in the next answer, is some evidence that none was intended to be made in the first.

It seems to me quite clear, that the answer "there is a watchman nights," is to be understood to mean there was a watchman in the factory every night. But evidence was given on the trial, of a custom of factories in that section of the country not to keep a watch from twelve Saturday night till twelve o'clock Sunday night, and that the answers are to be construed in reference to such custom. "A custom in order to become a part of a contract, must be so far established, and so far known to the parties, that it must be supposed that their contract was made in reference to it. For this purpose the custom must be established, and not casual—uniform, and not varying—general, and not personal, and known to the parties." (2 Parsons on Cont. 53; *Dawson* v. *Kittle,* 4 Hill, 107.)

Within the above rule it seems there was no such evidence as would authorize the court to find a custom amongst the factories in the vicinity of the one insured which should be permitted to control the language of the contract in question. The answers to the questions in the survey must be interpreted according to the popular meaning of the language used.

It is insisted by the defendant's counsel that the agent of

the insurer was informed that a watchman was not kept in the factory from twelve o'clock Saturday night till twelve. o'clock Sunday night, and, therefore, the case is to be considered as if the answers in ·question were in accordance with the verbal information.    But it is well settled that parol evidence cannot be received to control, explain or modify a warranty in an insurance policy.    (Angell on Ins. 143; *Jennings* v. *The Chenango Mutual Insurance Co.*, 2 Denio, 75; *Kennedy* v. *St. Lawrence Mutual Insurance Co.*, 10 Barb. 285.)

In the 2d Denio the court held that the rule which prevails upon sales of property—that a warranty does not extend to defects which are known to the purchaser—does. not apply to warranties contained in policies of insurance; and that parol evidence that the insured truly informed the agent of the insurer who prepared the application as to the situation of the buildings, which differed from the statement in the application, is not admissible.    The same propositions were restated in the case in 10 Barb. 285.

The question has been before this court, and I am unable to say what conclusion it has arrived at in reference to it.

In *Bidwell* v. *The Northwestern Ins. Co.* (19 N. Y. 179), it was held that when a marine policy stated the insurance to be on account of A., loss if any payable to B., and the vessel was warranted by the assured free from all liens, and B. held a mortgage on the vessel subject to two prior mortgages, the insurance was that of A., the owner, on the vessel, and not of B. upon his interest as mortgagee of A.'s equity of redemption; and that the prior mortgage was a breach of the warranty. and fatal to the recovery.    The answer admitted that the defendant was informed, when the.application for insurance was made, of the interest of the mortgagee, and that the loss was made payable to him to secure his interest as mortgagee.    The cause was again tried; there was a verdict and judgment for the plaintiff, which was affirmed at the general term, and again brought

11

before this court, and it is reported in 24 N. Y. 302. I do not find that the facts are materially changed, although the learned judge says they were; yet from his summary of them it does not appear that the case was especially changed. It was nevertheless held that the existence of the liens constituted no breach of the warranty. And the dicta in the opinion go the length of utterly sweeping away all the distinctions which have been supposed to exist between warranties in policies of insurance and contracts of sale. · If this court is at liberty to consider itself not bound by the decisions on this question, but that it may now establish a rule that it shall deem to be more wise and just, I am not prepared to say that the doctrine of the learned judge, in the case cited, is not the best. But I trust we shall adhere to principles which have been so long settled, and in conformity to which so many contracts have been made, and the abandonment of which will produce great injustice.

The doctrine of the case of *Bidwell.* v. *The North Western Insurance Co.*, last referred to, may stand without interfering with the cases in 2 Denio and 10 Barb., above cited, and I do not think the principles of the case should be extended beyond the facts of that case.

If I am right in supposing that parol evidence cannot be received to vary the warranty in this case, then the evidence given on that point, and received by the judge, should have been rejected.

The next inquiry in order is: Has the warranty been broken? On this subject there is no dispute. It is conceded by the defendant that if the answer to the question as to the watchman cannot be construed as it was construed by the learned judge at the circuit, then it was broken because it is true that no watch was kept from twelve o'clock on Saturday night until twelve o'clock on Sunday night.

The effect of the breach of the warranty is to annul the

policy without regard to the materiality of the warranty, or whether the breach had any thing to do in producing the loss.

The effect is very well stated by Marshall, in his work on Insurance, 249. He says: "A warranty being in the nature of a condition precedent, and therefore to be performed by the insured before he can demand performance of the contract on the part of the insurer, it is quite immaterial for what purpose or with what view it is made, or whether the insured had any view at all in making it. But being once inserted in the policy, it becomes a binding condition on the insured, and unless he can show it has been literally performed, he can derive no benefit from the policy. The very meaning of a warranty is to preclude all question whether it has been substantially complied with or not. If it be affirmative, it must be literally true; if promissory, it must be strictly performed. * * * * With respect to the compliance with warranties, there is no latitude, no equity. The only question is: Has the thing warranted taken place or not. If it has not, the insurer is not answerable for any loss, even though it did not happen in consequence of the breach of warranty."

I am unable to perceive any good reason why parties to a contract may not agree that an action for a breach of it shall be brought within a period shorter than that fixed for bringing an action, or that the right of action shall be deemed abandoned. So far from interfering with, it more effectually secures the end sought to be attained by the statute of limitations. This question was directly up in *Ames* v. *New York Union Insurance Co.* (14 N. Y. Rep. 253), and it was there held that such a condition in a policy of insurance was valid. Had it not been for the waiver of the condition in that case the action would have been barred.

But the plaintiffs meet this defense by alleging, and, as they claim, proving, that it was waived by the company,

and the learned judge charged the jury that if the defendant waived this condition the action could be maintained. He further instructed them that if the defendant suggested a postponement until certain attachments were removed, and at the same time were silent in regard to the limitation, that would be a waiver. The circumstances to which the judge alluded in this part of his charge must be the letter of the defendant's secretary, of the 23d June, 1849. That letter was written in reply to a demand by the treasurer of the Glendale Company for pay of the loss, and it informs Mr. Taft, to whom it was written, that the defendant would not enter on any negotiation touching the claim until the garnishee suits mentioned in the letter were removed.

It seems to me that a waiver, to be operative, must be supported by an agreement founded on a valuable consideration or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition.

There is not in this case any agreement to waive the condition requiring the suit to be brought within a year; nor is the defendant estopped from insisting on the condition.

If my tenant agrees to pay me rent on a day named, or his lease will be forfeited, and if before the day I agree, for a valuable consideration, to waive the condition, I am bound by the agreement. If, without consideration, I agree that he may pay after the day, and he, by reason thereof, omits to pay at the day, I am estopped from enforcing a forfeiture. But if, without consideration, I assent to a waiver of payment at the day, but before the day withdraw my assent, and insist on performance in such season as to enable him to perform, I am not estopped. Nor was the defendant in this case estopped, even if the above letter, or the negotiation between the officers of the factory and the insurer, could be considered as a waiver of the condition.

But I can find nothing in the evidence which would jus-

tify the inference that either party understood at the time there was a waiver. The letter of the 7th August must have removed any impression of the sort from the minds of the officers of the factory company. By that letter they were distinctly informed that the defendant would not recognize any claim against it under the policy, or upon any matter connected therewith. And what is entirely conclusive upon the subject, the factory company, within the year, commenced their action in Connecticut, thus demonstrating, in the clearest possible manner, that they did not then suppose the defendant had waived the condition.

In no aspect of the case am I able to discover any ground on which this action can be maintained. The judgment of the general term must be reversed and a new trial ordered, costs to abide the event.

All the judges concurring, on both grounds, judgment reversed.